Venable *vs.* Craig.

DELILAH M. VENABLE, plaintiff in error, *vs.* JAMES W. CRAIG, defendant in error.

1. When a libel for divorce was filed in 1863, in Jackson county, and with it a schedule of the property owned by the husband at the time of the separation, in which was included "a city lot, in the city of Atlanta," and the husband, in 1866, before the final verdict sold the lot to a purchaser, who had no actual notice of the pendency of the libel, and the jury, on the final trial, granted to the wife a divorce, *a viniculo matrimonii*, and decreed to her, as alimony, the real estate mentioned in the schedule, for life, with remainder to the children:

*Held*, That, under section 1720 of the Code, the sale by the husband, after the filing of the libel, the said sale not being in payment of preexisting debts, did not vest the title in the purchaser so as to prevent the vesting thereof in the wife, according to the verdict of the jury, on the final trial of the divorce case. The purchaser bought subject to the said verdict, and his want of actual notice does not protect him.

2. Negotiations and agreements between husband and wife, pending a libel for divorce, as to the alimony of the wife, and agreements between them in relation thereto, are, by presumption of law, merged in the final verdict of the jury in the divorce suit, and a purchaser from the husband, pending a suit of property, mentioned in the schedule, is bound by the verdict, as is the husuand, as to the legal rights of the wife to the property, unless he can show fraud in the verdict affecting his rights, and to do this, he must attack the judgment before the Court which rendered it, as he is a privy thereto.

3. When, in a schedule, filed with a libel for divorce, there is contained an item of "a city lot in Atlanta, worth $5,000 00:"

*Held*, That, as the schedule purports to be all the property of the husband, the description is sufficient to put everybody upon notice, if there be, in fact, but one such lot. LOCHRANE, Chief Justice, dissenting.

Judgments binding on parties and privies. *Lis pendens.* Divorce. Before Judge HOPKINS. Fulton Superior Court. April Term, 1871.

Craig's bill against Mrs. Venable made this case: On the 6th of August, 1866, he having lately moved into this State and settled in Fulton county, bought, at public auction sale, lot number thirty-six, on the west side of Marietta street, in Atlanta, Georgia, containing a half acre, at $2,800 00, cash,

and paid the auctioneer for it, and took a deed therefor from John Venable. The property had been advertised for sale, in a public gazette in Atlanta. He took possession, and built upon it a dwelling and store, etc., at a cost of $5,300 00. About twelve months afterward, he heard that Venable's wife claimed that said property had been set apart to her as permanent alimony, when she was divorced from Venable. Before this, he did not know that Venable had a wife, nor anything of their separation, etc. He then got from Jackson county, Georgia, a copy of a record, showing the following facts: In February, 1864, Mrs. Venable sued John Venable for a divorce, because of adultery, and he was served. She claimed no alimony, nor did she file any schedule of property owned by Venable at the time of separation. Venable pleaded not guilty, and condonation, and claimed a divorce from her for cruel treatment. In August, 1866, a jury gave her a first verdict of divorce *a viniculo matrimonii.* During August Term, 1866, of said Court, or afterwards, she made out and swore to a schedule of property, purporting to give a list of the property owned by Venable in 1863, when they separated. There was therein realty, estimated at $5,800 00, and personalty, estimated at $2,775 00. Of this realty was "one lot in the city of Atlanta, worth $5,000 00." This is the lot which Craig bought as aforesaid. It does not appear when said schedule was filed in the Clerk's office. In August, 1867, the jury rendered a verdict finally divorcing her from said Venable, giving to her during her life, and to the children after her death, all the property mentioned in the schedule, and recommending that Venable be allowed to marry again. The Court entered judgment accordingly, and ordered a writ of possession to issue according to law. This judgment excepted any part of the land which might be in possession of any *bona fide* purchaser, in payment of a debt due before the separation. The writ of possession is now held by the sheriff, and, under it, he is about to turn Craig out of possession of said land. Venable told Craig that he used

Venable *vs.* Craig.

said $2,800 00 in paying his debts, existing at the time of the separation.

Besides, on the 14th of October, 1863, Mrs. Venable had presented to Venable a deed of separation, in which he gave her various specified property, in lieu of any alimony, to which she acceded, in writing. Afterwards, she changed her mind, and she and he entered into a written contract, by which he gave to a trustee, for her, a negro man and $3,000 00, in consideration of which she released all claims upon him *in futuro.* She had not then sued him. This paper was sealed and recorded in said county of Jackson, on the 18th of August, 1864. The object of the divorce suit at first, was simply to obtain a divorce. The schedule was an after-thought. Venable had moved off to a considerable distance, and because of said provision, already made, supposed there would be no claim of alimony in said case. Or, she and her husband colluded to let him have a divorce also, and, therefore, he made no resistance as to the matter of alimony. This collusion was a fraud upon Craig, because he was a *bona fide* purchaser, for value, without notice of any of the facts. Because of the time and occasion of filing said schedule, and its vagueness, and because of said fraud, he prayed for an injunction against said writ of possession, etc. He prayed that she and Venable answer, etc. Venable was not served. She answered that she did not make the contract for a provision in lieu of alimony, and that Adams, the trustee, never signed it; that she did file a schedule of property when the suit was begun; that the paper alluded to by Craig was but an established copy of the original, which had been lost, and, not seeing said advertisement, or knowing of the sale, denied all fraud or collusion. She said her suit was notice to the world, and, therefore, the property was hers, by law, and worth $700 00 per annum for rent, and that Craig must look to Venable upon his warranty.

Upon the trial, (which was before the Judge only, by consent,) Craig testified to the *bona fides* of his purchase, his

want, of notice, his improvements, etc., as he had averred, and that he never heard of the agreement as to alimony till after the litigation began. His counsel then read in evidence said agreement. It purported to be a deed from Venable to one Adams, because of permanent separation from his wife, conveying to him, as trustee, a negro man and $3,000 00 in cash, for her and the childrens' support during her life, and at her death to the children, and she, in consideration of the premises, released him from all future claim for support for all time to come. It contained a covenant, by Adams, to hold the said property as such trustee. It was not signed by Adams, was signed and sealed by her and Venable, and was witnessed by one Thompson and a Justice of the Peace named Randolph. It was dated the 4th of November, 1863, and was recorded in Jackson county on the 4th of August, 1864. Here Craig rested his cause.

Mrs. Venable testified that Thompson and Randolph brought said paper to her to sign several times before she signed it; that she did not sign it till February, 1864. Thompson was her son-in-law. He came to Adams' where she was staying, told her it was a paper "fixed up for Court," and she must sign it; she said he was deceiving her, but he said he was not, and after about a half hour's hesitation she signed it without knowing what was in it, not having read it nor heard it read, nor heard its contents mentioned. She supposed it might be some paper drawn by her attorney, Silman. In October, before signing the paper, a negro man was sent to her to work, he was sick, stayed but two days, and she sent him back. No money was paid under said contract. They were married in 1841, and have five children, aged seven, ten, fifteen, twenty-four and twenty-seven years, respectively. She denied any collusion with Venable, or consent that he might be relieved from disability to marry. She said he had proposed to give her property in lieu of alimony, but she had refused. She denied seeing said advertisement or knowing anything of the sale till after her final divorce.

Adams testified that he is Venable's half-brother ; that he came in just after Mrs. Venable had signed said paper, and was requested to sign it, but refused, saying he would have nothing to do with the matter.  He thinks it was stated that it was the same paper which her attorney had brought to her to sign, that paper he had refused to sign because he thought the provision for her was insufficient.  He said Venable paid him no money nor property, that the negro man was sent to his house in October before, in his absence, and upon his return he took him back to Venable.

Thompson testified that in February, 1864, Venable persuaded him to take said paper to Mrs. Venable to sign ; that he did not read it, nor does he believe Mrs. Venable know its contents ; but while she obstinately refused at first to sign it, said she ought to be at home with her husband, and as he, Thompson, believed, signed it, thinking it might result in her returning home.  Adams refused to sign it for "various reasons."

Mr. Marler testified that Venable employed him to defend said suit, in 1865.  He advised him to make the best compromise he could, as to alimony, and not to defend the suit.  His property in Jefferson is claimed by Thompson.  He has heard Venable speak of his Atlanta property.  When the case came up for trial the schedule was lost, and Silman, her attorney, presented the one mentioned in the bill, saying it was a copy of the lost one, except that the Confederate valuation had been reduced to United States currency, and that it was sworn to because it was possibly- not an exact copy of the lost one.  Marler, believing it was a correct copy, except as aforesaid, consented that it might be established in lieu of the original, and that was done.

Mr. Silman testified that he filed the lebel' for divorce, with a sworn schedule attached to it, in which schedule was a house and lot in Atlanta.  The papers were lost and he established copies ; the copy schedule omitted the slaves and Confederate money mentioned in the first schedule, and

changed the value of the other items by putting them in United States currency. This was sworn to by Mrs. Venable, and was established, by consent of Venable's attorney, as a copy of the original. Before filing the libel, he presented to Venable a list of items of property which Mrs. Venable desired to have set apart for her, and he agreed to all but one item ; he objected to giving her a negro woman and family, saying they would be an expense to her. He indorsed upon the paper his willingness to comply, but she changed her mind before the matter was consummated. He drew a paper for her to sign, relinquishing claim of alimony in consideration of property to be settled upon her, and took it to her, but she refused to sign it and he had no more to do with the negotiations. He thought Venable's said offer was reasonable, considering his pecuniary condition. The house and lot, and personalty perhaps, in Jefferson, were sold under *fi. fa.* against Venable, and said Thompson bought them. It was never understood that the recorded settlement stopped claim for alimony, or that he would not resist Venable's being relieved from the disability to marry, nor did Mrs. Venable give any such directions. Venable's counsel made no defense, except to ask that he be relieved from disability, and witness appealed to the Judge to relieve him, because he thought it was right. They did not present said deed of settlement, but they did nothing to show that they were favoring Mrs. Venable. He, Silman, never saw the advertisement of the sale of the Atlanta lot.

Mr. Thurmond testified that he was one of Venable's counsel, and that they did not offer said recorded deed, because they were advised Mrs. Venable's signature to it was obtained unfairly, Adams never signed it, and the property and money mentioned in it were not delivered. The libel for divorce, with all the proceedings thereon, were exhibited to the bill and went as evidence to the Court.

He decided in favor of the defendant. Complainant moved for a new trial upon the ground that the finding was contra-

Venable *vs.* Craig.

ry to the evidence, the law and equity; because the Court erred in holding, first, that said recorded settlement was binding on complainant; and, second, that its legal sufficiency, validity and adequacy as to amount were not in issue in said divorce suit, and there adjudicated against Venable; and, third, that the notice to Craig by *lis pendens* was insufficient, because of the vague description of the property; and fourth, that Mrs. Venable's signing said deed put it in Venable's power to sell the property to Craig, especially when said deed is void for want of a trustee. A new trial was refused and error is assigned on said grounds.

HILLYER & BROTHER, for plaintiff in error. Parties and privies bound by fair judgment: R. Code, secs. 3538, 3535, 3776, 6074, 3121; 2 Story's Eq. Ju., secs 894-5-6-7, 884; 14 How. R., 70, 384; 12 Vt. R., 619; 13th, 477; 19th, 581; 5 How. R., 142; 9th, 279; 17th, 443; Adams Eq., 197; 6 Paige's R., 624; 16 Ala. R., 280; 17th, 672; 1 John. Cas., 491. Neglect of counsel does not change it: Hilliard on Neg., 85; R. Code sec 3700. Deed between husband and wife, without trustee, void: R. Code, secs. 2688, 1743, 1776; 8 John. R. 73; 5 Day's R., 47; 8 Ga. R., 349; 2 Ves. R., 352, 359, 361; 5 Bligh (U. S.) 375; 2 Story's Eq. Ju., sec. 1428 and note; 14 S. and M. R., 59; 2 Kent's Com., 176. Deed not acted upon no estoppel; 2 Parsons on C., 808, note x.; 30 Ga. R., 722; 13th, 526.

COLLIER & HOYT; B. H. THRASHER; ROBERT BAUGH, for defendant. Husband may bar wife's right to alimony by a settlement: R. Code, secs. 1736-7-9. No necessity for a trustee: R. Code, secs. 1783-4, 1776. Innocent purchaser, without notice, protected: R. Code, secs. 3037, 2590, 2598; 16 Ga. R., 190; 2 Vesey, Jr., R., 457; 10 Peters R., 210; 2 Story's Eq. Juris., secs. 1562-3. *Lis pendens* not applicable, because at purchase there was no schedule, and when it was filed it was too vague: 2 Wallace's S. C. R., 250; 9 Paige's R., 317; 16 Ga. R., 81; R. Code, secs. 1720, 1721.

Alimony may be from *corpus* of estate, or otherwise, as jury may decide: R. Code, sec. 1719. The verdict is void as to this lot for uncertainty: 30 Ga. R., 608.

McCay, Judge.

1. Section 1720 of the Revised Code is in these words: "After a separation no transfer by the husband of any of the property, except *bona fide* in payment of pre-existing debts, shall pass the title so as to avoid the vesting thereof, according to the final verdict of the jury in the cause." Unless this section is to have some other meaning than appears upon its face, every purchaser of property from the husband, after the separation, takes the title subject to the final verdict of the jury in the divorce cause. It is said that *this* meaning is so unreasonable, so contrary to justice and propriety, that it is the duty of the Court, if possible, to give the section a different construction. It is contended that the exception in the section, "except *bona fide* in payment of pre-existing debts," furnished a fair opening for such a construction. One little word " or," it is insisted, ought to be inserted so as to make the exception read, " except *bona fide*, or in payment of the pre-existing debts." This, it is said, would protect *bona fide* purchasers, without notice of the separation. This class of persons, it is said, are not only entitled to be protected upon principles of justice, but are, by another section of the Code, section 3037, declared entitled to it in very broad language, to-wit: " A *bona fide* purchaser, for value without notice of equity, will not be interfered with by a Court of equity." It is said, too, that the broad language of section 1720, if taken literally, works a great hardship on the husband, as under it, though he has a large estate, he can dispose of none of it, not even to obtain the necessaries of life.

To all this it may be replied, that this little word " or ' would make the whole section of no effect. If the husband may sell " *bona fide*," that is, *honestly, in good faith,*

then the only restriction upon him would be that he could not sell with intent to defraud the wife, and even of this intent the purchaser must have notice. Is it not perfectly apparent that, if the section read thus, the wife would have no protection at all, and that the whole purpose of the provision would fail? The husband might advertise and sell publicly all he had, or he might quietly dispose of it all. Who could say what was his intent? How could the wife prevent him? By bill of injunction? Could she take the oath required, or would the simple sale, if this were the law, justify the Chancellor in interposing? To make this section protect *bona fide* purchasers without notice of the separation simply, far other language than this word " or " would make of it is necessary. The ordinary language, as used in other parts of the Code where such a purpose is in view, would have been almost certainly used. The old Lien Act of 1806 was defective in this very particular. It seemed to *contemplate* this restriction, since it provides that the schedule shall contain the property owned at the time *of the separation*, and that the jury shall dispose of it by their verdict; yet there was no prohibition, in terms, against the sale by the husband. This left a painful uncertainty in the law as to this matter, and it was, doubtless, the object of this section to clear up this uncertainty. The words of the section are plain; the language leads, irresistibly, to the conclusion we have indicated, and any such construction as is contended for would be to interpolate, and put a meaning on the language of the law directly contrary to the plain and natural one. It is not for the Courts to do this. In doubtful cases, when the language is ambiguous, the argument *ab inconvenienti* may be resorted to, but, when there is no ambiguity, the maxim " *Ita lex scripta est* " is imperative. Nor can we join in the objection which is made to the justice and propriety of this provision. We see no other way to protect the wife. When the difficulties between husband and wife have come to the point of separation there is, generally, great bit-

terness of feeling, and were the property wholly in the power of the husband the wife would fare but poorly. The old notion that the wife is lost in the husband, and that everything is his, has been largely modified in modern times, and society now recognizes that the property is rather the property of both than of the husband alone. There is, therefore, no injustice in a law which declares that, when they can no longer live together, it shall not be in the power of one to dispose of the property of the community. Nor is there any special hardship on purchasers. Nothing is more common than to hold even purchasers to the rule of "*caveat emptor.*" Indeed, in almost all cases where a law is founded on public policy, a purchaser buys property subject to it at his peril.

Is not everybody bound to take notice that one is an infant, or that a woman is married? Why should not everybody be bound to take notice that a man has separated from his wife? The least inquiry in the neighborhood where he resides would almost always discover the fact. One is bound to make such inquiries, to know if there be a *lis pendens*, or a judgment, or a marriage settlement, and if the Legislature so provides, we see no objection, in furtherance of the public policy of protecting the wife, to putting the fact of separation on the same basis.

It will be noticed that this section of the Code does not make the sale void; it simply says, "a transfer shall not take place so as to prevent the title from vesting according to the verdict." The husband may sell subject to the verdict, and if he have sold property for purposes consistent with this policy of the law, to *protect* the wife, the jury will see to it, in their verdict, that no wrong is done by their decree.

2. The purchaser, as we have said, buys subject to the verdict. He is a privy to it; he stands in the shoes of the husband, and is bound by the verdict. Without doubt, the husband could not set up this agreement after and against the verdict. Supposing it to have been fairly made, and to

Venable *vs.* Craig.

have conformed to law in every particular, why was it not pleaded and set up as ⌐ bar to the verdict granting alimony? We have held, over and over again, that a judgment of a Court of competent jurisdiction is binding between the parties and their privies, as to all matters involved in the issue. Was not the right of the wife to alimony one of the chief issues in the divorce trial? If there was fraud and complicity between the husband and wife, by which the rights of this purchaser are affected; if, having fully settled between themselves, in a lawful way, the alimony dispute, they had procured this verdict with a fraudulent purpose, to affect the rights of purchasers, the verdict could, without doubt, be attacked in the proper Court. But it is a fixed rule, that the verdict concludes all parties privy to it, as to all matters involved in it. And this very question, to-wit: what should be the alimony of the wife, and out of what portion of the scheduled property it should be paid, was the very thing in issue, in the property part of the final verdict.

3. If we are right as to the question of the construction of section 1720 of the Code, the husband is under a disability to transfer any of the property after the separation, so as to prevent the vesting of the title according to the verdict. No *lis pendens* is necessary to give notice; the sale is prohibited by law, and everybody is bound to take notice. This disposes of the argument that the schedule does not affirmatively appear, in its present shape, to have been on file at the date of the sale. The proof is that the papers had been lost and a schedule was made out as nearly like the original as possible, and sworn to anew, because the estimated value of the property was changed from Confederate money valuation to a valuation in United States currency. We know of no authority that a *lis pendens* ceases to be notice if the papers be mislaid. Here was, in any event, notice that a suit for divorce was pending, and any one who knew this knew, by the law of the land, that all the property owned at the separation was subject to the final verdict. It was not necessary

to see the papers to know this ; it followed by operation of law. The schedule could at any time be amended. Indeed, it need not necessarily be filed with the writ, as, by section 1719, it may be filed afterwards, under the order of the Court. The only actual necessity for looking into the schedule is to determine whether the description is sufficiently plain and definite to enable possession to be given. The schedule purports to be a statement of all the property owned by the husband at the time of the separation. It sets forth a city lot in the city of Atlanta worth $5,000 00. As the husband had but one such lot, it was easy to show that the lot in question is that lot. That is certain which can be made certain. The officer must always, in executing a process, inquire for the lot by its description. If it is by metes and bounds, he must hunt them up ; if it is by a statement of the names of the adjoining lot owners, inquiry must be made and acted on. And so here. The record may be looked to for the title of the husband, and inquiry made, as in other cases, to get at the truth.

Judgment reversed.

WARNER, Judge, concurred, but furnished no opinion.

LOCHRANE, Chief Justice, furnished no opinion. From the bench he dissented as follows :

While A bought property at public auction, sold as the property of B, and paid therefor a full consideration, and at the time of the sale B and his wife were separated, under section 1720 of the Code, I do not think the title of the husband was so limited as to prevent the sale of the property *bona fide* by the mere fact of the separation, or that it was the duty of A to inquire into the domestic relations of B, and that the wife's rights or equities are superior to those of a *bona fide* purchaser for consideration without notice.

When a divorce suit was filed in 1864, and the schedule sworn to containing the property in controversy was filed

after the purchase by A, I hold that such suit was not no-tice to A of the wife's claim to the property, and the fact that previous papers in the case had been lost could not operate to effect A with notice of an equity in the wife until after the schedule containing his property was filed.

When the schedule contained the description of the prop-erty as one lot in the city of Atlanta, I think the description too indefinite and uncertain as to the property claimed to ope-rate as notice by *lis pendens,* so as to defeat the title of a *bona fide* purchase, etc.

When, upon the record, it appeared that B and his wife had a settlement for alimony, in which adequate means were admitted to be made by the wife who signed the same, I think such record may be asserted by A in defense of his rights.

When the verdict of the jury is in favor of the wife for the property contained in the schedule, being one lot in the city of Atlanta, I think such judgment does not divest the title of a *bona fide* purchaser under the facts ; and, upon the record, I think the judgment of the Court below ought to be affirmed.